IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GILBERT EARL SMITH,<br><br>          Petitioner,<br><br>     v.<br><br>MATTHEW ATCHLEY,<br><br>          Respondent. | No.  2:21-cv-02080-TLN-DMC-P<br><br>FINDINGS AND RECOMMENDATIONS |

   Petitioner, a state prisoner proceeding with retained counsel, brings this petition for a writ of habeas corpus under 28 U.S.C. § 2254. Pending before the Court are Petitioner's petition for a writ of habeas corpus, ECF No. 1, Respondent's answer, ECF No. 10, and Petitioner's traverse, ECF No. 24.

   Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  Under AEDPA, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in

/ / /

/ / /

/ / /

1

state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law. Under both standards, "clearly established law" means those holdings of the United States Supreme Court as of the time of the relevant state court decision. See Carey v. Musladin, 549 U.S. 70, 74 (2006) (citing Williams, 529 U.S. at 412). "What matters are the holdings of the Supreme Court, not the holdings of lower federal courts." Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en banc). Supreme Court precedent is not clearly established law, and therefore federal habeas relief is unavailable, unless it "squarely addresses" an issue. See Moses v. Payne, 555 F.3d 742, 753-54 (9th Cir. 2009) (citing Wright v. Van Patten, 552 U.S. 120, 28 S. Ct. 743, 746 (2008)). For federal law to be clearly established, the Supreme Court must provide a "categorical answer" to the question before the state court. See id.; see also Carey, 549 U.S. at 76-77 (holding that a state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice created by state conduct at trial because the Court had never applied the test to spectators' conduct). Circuit court precedent may not be used to fill open questions in the Supreme Court's holdings. See Carey, 549 U.S. at 74.

   In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards. A state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. See id. at 405. A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases. See id. In sum, the petitioner must demonstrate

2

that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules. Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard. See id. at 406. If a state court decision is "contrary to" clearly established law, it is reviewed to determine first whether it resulted in constitutional error. See Benn v. Lambert, 283 F.3d 1040, 1052 n.6 (9th Cir. 2002). If so, the next question is whether such error was structural, in which case federal habeas relief is warranted. See id. If the error was not structural, the final question is whether the error had a substantial and injurious effect on the verdict, or was harmless. See id.

State court decisions are reviewed under the far more deferential "unreasonable application of" standard where it identifies the correct legal rule from Supreme Court cases, but unreasonably applies the rule to the facts of a particular case. See Wiggins v. Smith, 539 U.S. 510, 520 (2003). While declining to rule on the issue, the Supreme Court in Williams, suggested that federal habeas relief may be available under this standard where the state court either unreasonably extends a legal principle to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. See Williams, 529 U.S. at 408-09. The Supreme Court has, however, made it clear that a state court decision is not an "unreasonable application of" controlling law simply because it is an erroneous or incorrect application of federal law. See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003). An "unreasonable application of" controlling law cannot necessarily be found even where the federal habeas court concludes that the state court decision is clearly erroneous. See Lockyer, 538 U.S. at 75-76. This is because "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." Id. at 75. As with state court decisions which are "contrary to" established federal law, where a state court decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless unavailable if the error was non-structural and harmless. See Benn, 283 F.3d at 1052 n.6.

///
///
///

3

The "unreasonable application of" standard also applies where the state court denies a claim without providing any reasoning whatsoever. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). Such decisions are considered adjudications on the merits and are, therefore, entitled to deference under the AEDPA. See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 223 F.3d at 982. The federal habeas court assumes that state court applied the correct law and analyzes whether the state court's summary denial was based on an objectively unreasonable application of that law. See Himes, 336 F.3d at 853; Delgado, 223 F.3d at 982.

## I. BACKGROUND

### A. Facts[1]

The state California Court of Appeal recited the following facts in its opinion on direct appeal, and Petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> Lazaga testified that, on July 8, 2016, he was substituting for a Brink's courier who had called in sick. A Brink's courier services ATMs and delivers and picks up money. Lazaga had no guard and his driver was a new hire not yet authorized to carry a firearm. Lazaga was not wearing a bulletproof vest because he was supposed to be in the office that day.
> At about 9:00 a.m., Lazaga and the driver arrived at a Golden 1 Credit Union in Sacramento. Lazaga went into the bank and serviced the ATMs. He left with two large Brink's bags containing $369,667 and headed towards the Brink's truck. Lazaga heard someone yelling, "drop the bag." He turned and saw a man with a gun. The man was wearing a hood and a neon vest and his face was covered. Lazaga dropped the bags, turned away, and took a couple of steps before the man shot him in the back. Lazaga turned back and fired at the man. An exchange of gun fire ensued. Lazaga saw the man go down. Lazaga tried to walk back to the Brink's truck and lost consciousness.

///

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct." Findings of fact in the last reasoned state court decision are entitled to a presumption of correctness, rebuttable only by clear and convincing evidence. See Runningeagle v. Ryan, 686 F.3d 759 n.1 (9th Cir. 2012). Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See id. These facts are, therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be referred to as "defendant."

> A witness in the bank testified he saw a man in a green reflective jacket come out of a red SUV. The man fired at a man who left the bank with bags of money. The man from the SUV grabbed the bags of money and went towards the SUV. There were shots and this man went down.
> A sheriff's deputy testified that on arriving at the scene he found defendant on the ground. Defendant was wearing bandanas and a respirator mask covering his face. He had a pulse but was not breathing. The deputy turned defendant on his side to open his airway. There were multiple bags of currency around defendant and a handgun about 10 feet away.
> Defendant testified on his behalf. He acknowledged the red SUV was stolen. He asked a female friend for a stolen car, told her he was going to rob an armored truck, and promised to share the proceeds. Defendant's friend obtained the red SUV and was the driver on the day of the robbery.
> Defendant was covered up because he didn't want to be identified. He had a loaded gun but his plan was to scare the Brink's courier, not shoot him. When Lazaga came out of the bank, defendant had the gun in his right hand and bear spray in his left. Defendant wanted to "mace" Lazaga to get the money. Defendant knew that as felon he was not supposed to have a gun or mace.
> When Lazaga came out of the bank, defendant ran towards him, yelling at him to drop the bag. Lazaga turned around when defendant got within a couple feet. It was too close to use the mace. Defendant testified that he grabbed one of the bags with his left hand, which held the can of mace, and "hooked" the strap of the other bag, with his right hand that held the gun. There was a tug of war over the bags. The mace fell out of defendant's hand. His gun went off. Defendant thought he had hit Lazaga.
> Defendant grabbed the bags and ran, picking up the pepper spray to avoid leaving fingerprints. But when he turned his back Lazaga shot him twice. Defendant kept on running. He turned towards Lazaga, who shot him two or three more times.
> Defendant had the gun in his hand as he fell to the ground. He was squeezing a bag handle and holding the gun with the same hand, and the gun started shooting at the ground. Defendant acknowledged that there were eight shell casings matching his gun found at the scene of the crime. Defendant testified he did not mean to intentionally shoot the gun off seven more times.

ECF No. 11-1, pgs. 3-6.

### B. Procedural History

A jury convicted Petitioner of attempted murder, robbery, and unlawful possession of firearm by a felon, and found allegations of personal use of a firearm, intentional discharge of a firearm, and discharge of a firearm causing great bodily injury were true. See id. at 1-2. The trial judge sentenced Petitioner to seven years for attempted murder and 25 years to life for discharging a firearm causing great bodily injury. See id. With additional terms for the other firearm enhancements, and pursuant to a plea deal in a trailing case against Petitioner, the total

5

1  sentence imposed was 36 years and four months to life.  See id.

2  Defendant pursued a timely direct appeal. See ECF No. 1, pg. 7. The California

3  Court of Appeal issued the latest reasoned decision on the merits and affirmed Petitioner's

4  convictions on March 6, 2020. See ECF No. 11-1, pgs. 3-20. The California Supreme Court

5  denied review without comment or citation.  See ECF No. 11-6, pg. 1.  Petitioner did not file any

6  state court post-conviction actions.

## II.  DISCUSSION

Petitioner raises two claims.  First, Petitioner argues that he was denied his right to equal protection when the trial court denied petitioner's motion under Batson v. Kentucky, 476 U.S. 79 (1986).  See ECF No. 1, pgs. 27-33.  Second, Petitioner argues that he was denied his right to an impartial jury and his Fourteenth Amendment right to due process when the court denied his motion for juror information regarding potential juror misconduct.  See id. at 33-37.

**A.     *Batson* Motion**

In Batson v. Kentucky, 476 U.S. 79 (1986), the United States Supreme Court held that the Equal Protection Clause prohibits a prosecutor from exercising peremptory challenges to strike a venireperson on the basis of race. The decision in Batson provides a three-step process for determining when a strike is discriminatory.  See Foster v. Chatman, 578 U.S. 488 (2016).

First, to prevail on the so-called Batson claim, the defendant must establish a prima facie case of purposeful discrimination.  See United States v. DeGross, 960 F.2d 1433, 1442 (9th Cir. 1990).  A prima facie case is established by showing that a peremptory challenge was exercised against a member of a constitutionally cognizable group and by demonstrating that the fact of the challenge and any other relevant circumstances demonstrate that an inference has been raised that the peremptory challenge was exercised because of membership in the cognizable group. See id.  Under Batson, the totality of the circumstances of the particular case must be examined to determine whether a prima facie case of prosecutorial discrimination has been established.

///

Second, if the defendant makes such a showing, the burden then shifts to the prosecutor to give adequate nondiscriminatory reason(s) for the challenges. The prosecutor must then provide a clear and reasonably specific explanation of the legitimate reason(s) for the challenges to overcome this burden. See Batson, 476 U.S. at 98.

Third, if the prosecutor makes such a showing, the trial court must then determine whether the defendant has established purposeful discrimination. See id. The court must evaluate the persuasiveness of the prosecutor's articulated reason since the purpose of the court's assessment is to determine their subjective believability, not the objective reasonableness of their decision to strike a prospective juror. See Miller-El v. Cockrell, 537 U.S. 322, 338-39 (2003); Batson, 476 U.S. at 98 n.21.

The California Court of Appeal denied Petitioner's appeal in a decision issued on March 6, 2020. See ECF No. 11-1, pgs. 3-19. In reviewing and denying Petitioner's claim, the state court stated as follows:

> The prosecutor used a peremptory challenge to excuse one of two African-American members in the jury venire. Defendant, who is African-American, challenged the prosecutor's action under *Batson-Wheeler*. (*Batson v. Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712] (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).) The trial court denied the motion, finding the prosecutor did not excuse the prospective juror based on race.
> Defendant contends that the trial court failed to make a sincere and reasoned effort to determine whether the prosecutor was racially motivated in exercising a peremptory challenge. Defendant argues that the prosecutor did not challenge a non-African-American panelist whose answers in voir dire were similar to those of the excused juror. [footnote omitted]
>
> A.   *Background*
>
> There were two African-American jurors in the venire: Juror No. 6676359 and M.F.
> The prosecutor passed on three opportunities to exercise a peremptory challenge to Juror No. 6676359. Juror No. 6676359 was seated in the jury.
> In voir dire, Juror No. 6676359 stated he had served as a juror in three cases, two of which were criminal cases where the jury reached verdicts. Juror No. 667359 stated his belief that "there is a certain amount of bias against black men in the criminal justice system, and that is a concern that I have." The court responded, "I can see where you would have that concern. There is -- the numbers seem to bear that out."

///

       Noting that defendant was himself African-American, the court asked if Juror No. 6676359 could give both defendant and the People a fair trial, based on the facts presented. Juror No. 6676359 answered, yes. Defense counsel asked Juror No. 6676359, if, after having seen all the evidence, and he believed that the prosecution had proven guilt beyond a reasonable doubt, would he have qualms about voting guilty. Juror No. 6676359 said, no. Juror No. 6676359 confirmed that, on the other hand, if the prosecution did not prove guilt beyond a reasonable doubt, he would have no difficulty in voting not guilty. Later in voir dire, the prosecutor noted that Juror No. 6676359 had mentioned potential bias, and asked him if he meant in the justice system or law enforcement, or both. Juror No. 6676359 replied, both. The prosecutor followed up by asking if Juror No. 6676359 saw something on the news where he thought a black man was wrongly convicted, would he be upset about what's going on in this country and hold the People to a higher standard. Juror No. 6676359 said, no.

       M.F. was the juror struck by the prosecution. During voir dire, the following colloquy occurred between M.F. and the prosecutor:

"[Q]: [M.F.], if this were a theft case, do you think the standard of proof should be different, meaning, if it's a less serious case should it be -- should it require less for us to convict somebody?

"[A]: No.

"[Q]: Do you think the standard should be the same or different?

"[A]: I would suppose it should be the same.

"[Q]: It's the same.

"And that's what the law is in a criminal case. Doesn't matter whether it's a triple homicide or whether it's a misdemeanor petty theft, the standard is beyond a reasonable doubt.

"As the Judge told you there's a couple different -- there's several charges. It's three total charges plus some allegations.

"Just hypothetically, let's say you believed all three were proven beyond a reasonable doubt, but there was one of those charges that was so overwhelming, you'd never seen that much proof, and the defense even got up and said, this one is a joke, of course he's guilty of this one, what would be your vote in that scenario on the charges?

"[A]: Not guilty until proven so.

"[Q]: Okay. But under my little scenario you believed the evidence proved all three beyond a reasonable doubt, what would your verdict be?

"(Pause.)

"[Q]: Hypothetically -- I'm saying if you voted now, you'd have to vote not guilty, but if the evidence came and you believed based on the evidence the three charges were proven, what would your verdicts have to be?

"[A]: Would have to be guilty, I suppose.

"[Q]: Okay. And is there a reason you would have hesitation with that?

"[A]: No.

"[Q]: Okay. What we want in the system, is each side wants a fair trial. So it's our obligation to prove the charges. If we fall short, then your verdict would be not guilty, but if we do prove the charges we need to have jurors that are willing to say, that charge is proven beyond a reasonable doubt, so the appropriate verdict is guilty.

"Is that something you can do?

"[A]: Yes."

The session ended for the day and the next day the defense passed M.F. and the prosecutor used a peremptory challenge to excuse her.

The defense made a *Batson-Wheeler* motion. Defense counsel stated as the basis of the motion that the prosecutor's question to M.F. "involved sort of a double negative, and it wasn't a perfectly smooth transition, but . . . I don't believe [M.F.] said anything that would cause the prosecutor to have a concern." He continued that "the entire panel . . . has [M.F.] and then (6676359) as the African Americans. Her answers to me seemed absolutely middle road. I don't believe she said anything to indicate that she was biased towards one side or the other, and I do feel like she's been removed based on her race."

The trial court invited the prosecutor to respond as to whether the defense had established a prima facie case. The prosecutor stated that the People had no intention of dismissing a juror based on race. Juror No. 6676359 appeared to be African-American and was not challenged. There also appeared to be people of different ethnicities on the jury. The reason the People excused M.F. was because "she appeared to have some hesitancy . . . if hypothetically the evidence proved the defendant's guilt beyond a reasonable doubt, would she vote guilty."

Defense counsel responded that the prosecutor's "questions to [M.F.] were not his best. By the end it was clear what she was being asked, and she clearly said that she would be comfortable voting guilty if proof was there beyond a reasonable doubt. [¶] So I disagree with the characterization. I don't think she hesitated. I think she was a little confused at first because of the way the question was phrased."

The trial court observed that "we kind of skipped a step" because the prosecutor did not state whether a prima facie case had been shown, but "did go on to state . . . why he exercised his peremptory challenge as to [M.F.]."

The court then ruled as follows:

"The Court is mindful that the prosecution passed at least, I believe, three times where (6676359) was on the jury. He does appear to be African American. That does at least factor into my analysis.

"While I agree [the Prosecutor's] questions were not as articulate as they possibly could be . . . [M.F.] did seem to have some reluctance, although it was somewhat confusing to the Court because it -- initially it did appear to be some reluctance, and then there was a follow-up question in which [her] reluctance seemed to dissipate on whether or not she could follow the law in terms of finding [the defendant] guilty beyond a reasonable doubt if the People have proved it.

"At this point the Court doesn't feel that the challenge was based on a racial factor. It was more of a neutral finding with respect to whether or not she could follow her burden -- or the People's burden, I should say, in following the law. So at this point I will deny the defense motion pursuant to *Batson-Wheeler*."

B.   *Analysis*

* * *

Substantial evidence supports the trial court's denial of defendant's *Batson-Wheeler* motion. The prosecutor stated that he excused M.F. because she expressed hesitancy in answering a question about a hypothetical scenario. The hypothetical posited that where there were three charges, as in defendant's case, and M.F. believed guilt was proven

9

beyond a reasonable doubt on all three, but the evidence on one charge was "so overwhelming, you'd never seen that much proof" since guilt was so obvious the defense even conceded it. As the trial court noted, M.F.'s response indicated a reluctance to convict in that scenario without further proof. Only when the prosecutor reminded M.F. in follow-up questioning that his scenario was premised on proof beyond a reasonable doubt on three charges did her "reluctance seem[] to dissipate . . . ." The court concluded that the challenge involved "more of a neutral finding with respect to whether or not she could follow . . . the People's burden . . . in following the law."

A prospective juror's difficulty and hesitance in understanding the burden of proof can serve as a race-neutral reason to exercise a peremptory challenge. (*People v. Mills* (2010) 48 Cal.4th 158, 176-177 (*Mills*), citing, inter alia, *People v. Kelly* (2008) 162 Cal.App.4th 797, 805, fn. 10; *People v. Rodriguez* (1999) 76 Cal.App.4th 1093, 1114.) That a prospective juror appears to be confused is a legitimate, nondiscriminatory reason for a peremptory challenge. (*People v. Taylor* (2009) 47 Cal.4th 850, 893-894; *People v. Watson* (2008) 43 Cal.4th 652, 682.)

Defendant leans heavily on the trial court's comment that M.F.'s confusion "dissipated" after the prosecutor clarified his question, as indicating that the court did not conduct a proper inquiry into racial bias. However, that M.F. agreed her verdict would be guilty after the prosecutor's follow-up questions does not undermine the prosecutor's reliance on her initial hesitance and confusion. (*Mills, supra*, 48 Cal.4th at p. 177, fn. 5.)

Additionally, the trial court considered as a "factor" that the prosecutor had passed on one African-American juror, Juror No. 6676359, while excusing M.F. (*People v. Hartsch* (2010) 49 Cal.4th 472, 487 [the prosecutor's acceptance of African-American prospective jurors "was 'an indication of the prosecutor's good faith in exercising his peremptories, and . . . an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection' "].) That the prosecutor did not challenge another African-American juror demonstrates a lack of discriminatory purpose. (*People v. Blacksher* (2011) 52 Cal.4th 769, 802; see also *People v. Jones* (2011) 51 Cal.4th 346, 362; *People v. Lenix* (2008) 44 Cal.4th 602, 629 (*Lenix*); *People v. Kelly* (2007) 42 Cal.4th 763, 780.) Further, excusing one or two African-American jurors can rarely establish a pattern of discrimination. (*People v. Clark* (2016) 63 Cal.4th 522, 567; *People v. Harris* (2013) 57 Cal.4th 804, 835; *People v. Bonilla* (2007) 41 Cal.4th 313, 343.)

Lastly, defendant relies on comparative analysis to contend that the prosecutor's explanation for challenging M.F. was implausible. Defendant argues that "the prosecutor presented a convoluted hypothetical to the African American juror, and his reason for striking her was her hesitation, The prosecutor presented a similar convoluted hypothetical to white juror [C.P.], but he did not strike her."

"'[I]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination.' [Citation.]" (*Foster, supra*, 136 S.Ct. at p. 1754.) However, "comparative juror analysis is but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination." (*Lenix, supra*, 44 Cal.4th at p. 622.)

///

> We disagree that comparative analysis indicates that the prosecutor's explanation for excusing M.F. was implausible. The prosecutor questioned C.P. in voir dire after she stated that, in her work with families that experienced incarceration or probation, she had clients of color, including African-Americans, who she felt were disproportionately represented in the criminal justice system. The "convoluted hypothetical" posed to C.P. involved the prosecutor's statement that if defense counsel had conceded that part of the charges were true, i.e., that defendant had a gun that day, what would C.P.'s vote be if asked to vote right now. C.P. answered that she "wouldn't be able to decide without the facts." The prosecutor observed that this was because of the presumption of innocence, which C.P. agreed made sense. Conversely, the prosecutor asked all the prospective jurors present that if defense counsel argued something similar at the end of the case whether they thought they could not make an objective determination. There were no responses. The prosecutor explained that his point was that the decision could not be based on the attorneys' arguments but must be based on the evidence and the trial court's instructions on the law. [footnote omitted]
>
> On the basis of this colloquy, we find that M.F and C.P. are not similar. C.P.'s comments about African-Americans being disproportionately represented in the criminal justice system makes C.P. more similar to Juror No. 6676359, who was passed three times by the prosecutor and served on the jury. Further, unlike M.F., C.P. expressed no confusion or hesitancy in answering the prosecutor's questions, including the "convoluted hypothetical." "[F]or a comparative analysis to be probative, a seated juror must have a ' "substantially similar *combination* of responses," in all material respects' to an excused juror. [Citation.] Although jurors need not be completely identical for a comparison to be probative [citation], "they must be materially similar in the respects significant to the prosecutor's stated basis for the challenge." ' " (*Bryant, supra*, 40 Cal.App.5th at p. 540, quoting *People v. Winbush* (2017) 2 Cal.5th 402, 443.) Defendant did not show that M.F.'s responses were like C.P.'s.
>
> In addition, defendant "did not raise the issue of comparative analysis in the trial court, and thus the prosecution never had the opportunity to explain perceived differences" between M.F. and C.P. (*Bryant, supra*, 40 Cal.App.5th at p. 542, citing *Lenix, supra*, 44 Cal.4th at p. 623; *Winbush, supra*, 2 Cal.5th at p. 442 [" ' "a formulaic comparison of isolated responses [is] an exceptionally poor medium to overturn a trial court's factual finding" ' " concerning the subjective reasonableness of a prosecutor's proffered reasons for excusing a juror].) " '[C]omparative juror analysis on a cold appellate record has inherent limitations. [Citation.] . . . On appellate review, a voir dire answer sits on a page of transcript. In the trial court, however, advocates and trial judges watch and listen as the answer is delivered. Myriad subtle nuances may shape it, including attitude, attention, interest, body language, facial expression and eye contact.' " (*Bryant, supra*, 40 Cal.App.5th at p. 542, quoting *Lenix, supra*, 44 Cal.4th at p. 622.) While we may consider comparative juror analysis for the first time on appeal, the record must be adequate to allow the comparison. (*Ibid.*) By not raising the issue below, defendant denied the prosecutor the opportunity to make such a record. (*Ibid.*)

ECF No. 11-1, pgs. 10-13.

///

Petitioner's argument in relation to this claim is divided into two sections. First, Petitioner asserts that the state court applied the incorrect legal standard and, accordingly, that this Court should review the case de novo. According to Petitioner:

> This Court should apply de novo review because the trial court applied the wrong legal standard in determining whether a *Batson* violation occurred. *Crittenden v. Ayers*, 624 F.3d 943, 954 (9th Cir. 2010).
> The fact that the prosecutor left one black juror on the jury does not disprove that the prosecutor perempted the other black jurors for race-based reasons. *Batson* explicitly holds that a violation occurs when the prosecution challenges even one minority juror for a race-based reason. That is because *Batson* is not merely a representative jury case. *Batson* enforces the Fourteenth Amendment equal protection rights of individuals belonging to a minority to serve on juries. 476 U.S. at 97. Those individual's rights are not vindicated when they are improperly discharged for race-based reasons, even if other minority jurors are allowed to serve. *Id.* at 98; *Snyder v. Louisiana*, 552 U.S. 472 (2008)("[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose.")
> The law is clear that leaving minority jurors on the jury does not disapprove a *Batson* violation when the prosecutor perempts a prospective juror of the same protected class. *See Castellanos v. Small*, 766 F.3d 1137 (*Batson* violation occurred when prosecutor peremptorily challenged four Hispanic jurors for race-based reasons, even though seven Hispanic jurors remained on the jury); *Turner v. Marshall I,* 63 F.3d 807, 812 (9th Cir. 1995) (primia facie *Batson* violation occurred when the prosecutor struck five Black jurors, but allowed four Black jurors to remain on jury), *Paulino v. Harrison II*, 542 F.3d 692, 694 (9th Cir. 1995)(*Batson* violation found when prosecutor perempted five Black jurors, but allowed one Black person to remain on jury); *Derrick v. David L.*, 321 F.3d 824, 826-827, 834-35 (9th Cir. 2003)(*Batson* violation found when prosecutor challenged one Black alternative, even though one Black juror sat on regular jury)
> That the prosecutor left one Black juror on the jury is of little or no consequence in determining whether the prosecutor's peremptory challenge to Ms. Franklin was exercised for a discriminatory purpose. As such, the trial court failed to follow the proper legal standard as required by federal law in determining whether a *Batson* violation occurred.

ECF No. 1, pgs. 32-33.

Respondent argues:

> "[A] decision by a state court is 'contrary to' [the] clearly established law [of the Supreme Court] if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases.'" *Price v. Vincent*, 538 U.S. 634, 640 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). Petitioner has not identified any rule applied by the state courts that contradicts *Batson*. He intimates that the state courts held the prosecutor's challenge was proper only because there was no challenge to the remaining black prospective juror, but that is not what the state courts did. Each court analyzed the statistical evidence among other factors in

determining there was insufficient evidence of purposeful discrimination. Using statistical evidence as one factor to determine whether the prosecutor's stated reason was genuine is not contrary to *Batson*. *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003); *see id.* (Court analyzing the percentage of black prospective jurors the prosecutor struck); *see also Flowers v. Mississippi*, 139 S. Ct. 2228, 2246 (2019) (Court recognizing prosecutor struck five of six black prospective jurors). Some fairminded jurist could find it incorrect, then, that the state courts' use of statistical evidence as one factor to consider when determining the prosecutor's credibility ran afoul of Supreme Court precedent.

ECF No. 10, pgs. 20-21.

As stated by both the state court and Respondent, the prosecutor's behavior in relation to other jurors of the same race as the one challenged, while not being dispositive, is a factor that a court may consider during step three of the Batson analysis. See Miller-El v. Cockrell, 537 U.S. 322, 338-39 (2003).  Petitioner's brief lacks any authority that shows that it was error, let alone contrary to federal law, for the state court to consider this factor when making its determination. Petitioner's emphasis on the court's consideration of this factor as proof that the state court applied the improper legal standard is misguided.  Accordingly, this Court finds no reason to review the matter de novo and will afford the state court the deference it is entitled. Because the state court applied clearly established law, the Court will review Petitioner's remaining contention to determine whether the state court's decision was unreasonable.

In this regard, Petitioner argues that his rights were violated when his Batson challenge was denied because the prosecutor's reason for the denial was disingenuous.  Petitioner asserts:

Here**,** the prosecutor struck 50% of the African American jurors. His only reason, that Ms. Franklin was hesitant, was debunked by the trial court. The error arose in the analysis the court conducted on the reason. The prosecutor's reason was not genuine. The court disagreed with the reason and found the hesitation had been caused by a confusing question and had been dissipated. So what genuine basis could there have been then for the court to conclude there was no discriminatory intent? The court's finding and ruling are internally inconsistent.
    The trial court found that any hesitancy was caused by the prosecutor's confusing question statement, and was dissipated by further questioning. So the court's finding that the challenge was not based on a racial factor, it was more of a neutral finding with respect to whether she could follow her burden, or the People's burden in following the law, does not indicate that it conducted the thorough and careful inquiry at *Batson*'s third step exemplified by the high court's decisions in *Miller–El v. Dretke*,

13

545 U.S. 231 (2005). The inquiry at *Batson*'s third stage requires more than a determination of inherent or apparent plausibility; it "requires the judge to assess the plausibility of [the prosecutor's stated] reason in light of all evidence with a bearing on it." *Miller–El v. Dretke,* 545 U.S. at p. 252. Nothing in the record shows that the trial court conducted the requisite inquiry.

ECF No. 1, pg. 30.

Respondent argues:

> The trial judge's ruling bears out the proper focus. While recognizing that the cause of hesitancy or confusion could have come from the prosecutor, and the confusion may have dissipated, the trial court still focused on the subjective genuineness of the prosecutor's stated reason. *Purkett v. Elem*, 514 U.S. at 769 (correcting the court of appeal for focusing on "the reasonableness of the asserted nonracial motive […] rather than the genuineness of the motive."). In this way, the state court of appeal reasonably found that the trial court was properly analyzing the prosecutor's reason for exercising the challenge.
> The state court of appeal, then, reasonably determined that the record supported the trial court's ruling. A fairminded jurist could conclude that the prosecutor's concern with the prospective juror's hesitation was borne out by the record where even the court reporter noticed the hesitation and transcribed, "(Pause.)" when the prospective juror failed to answer the prosecutor's hypothetical question. (Lodged Document 1 at 6.) That fairminded jurist could find the prosecutor was genuinely concerned with this hesitation as clearly indicated by the prosecutor's pointed follow-up question to the prospective juror, "And is there a reason you would have hesitation with that?" (Lodged Document 1 at 6; *see Paulino v. Harrison*, 542 F.3d 692, 701 n.8 (9th Cir. 2008) ("[A] prosecutor's questions might provide some evidence of the prosecutor's actual reasons for striking a juror"); cf. *Miller-El v. Dretke*, 545 U.S. at 246 (failure to address issue of alleged concern during voir dire raises doubts regarding prosecutor's stated reason for peremptory).) It was thus reasonable to find record support for the trial court's ruling.
> The state court of appeal then reviewed the remainder of the record to determine whether there was evidence that the prosecutor's reasons were pretextual. Petitioner used comparative juror analysis in an attempt to show the prosecutor was not genuinely concerned with the prospective juror's hesitation in applying the standard of proof to a hypothetical situation. He argued that the prosecutor posed similar hypothetical questions to a non-black juror ("C.P.") yielding similar confusion, but without prosecutorial challenge. (Lodged Document 1 at 11.) The state court of appeal analyzed the exchanges between the prosecutor and C.P., and found no apparent hesitancy. C.P. appeared to understand and answer questions appropriately. (*Id.* at 11-13.) In fact, the state court of appeal compared C.P.'s answers to both the prospective juror and the remaining black juror, and found C.P. was more similar to the remaining black juror than to the prospective juror. As such, a fairminded jurist could conclude that "[c]omparative analysis . . . supports the justification proffered, as no

///

14

> seated juror possessed the trait that the prosecutor identified as the reason for the strike." *Jamerson v. Runnels*, 713 F.3d 1218, 1228 (9th Cir. 2013).

ECF No. 11, pgs. 21-23.

The state court correctly noted that a prospective juror's hesitance in understanding the burden of proof can serve as a race-neutral reason to exercise a peremptory challenge. The court also pointed out that the mere fact that the concerns around the prospective juror were dissipated through follow-up questions is not proof that the prosecutor's personal concerns about the juror were eradicated. As Respondent observes, Petitioner's argument disregards the prosecutor's state of mind. It is not the duty of the court at step three of the Batson analysis to assess the reasonableness of the stated reason, but rather the reason's genuineness. See Purkett v. Elem, 514 U.S. 765, 769 (1995). Petitioner unfairly presumes that the prosecutor's decision to use a peremptory challenge must have been for reasons other than the one stated since the court, not the prosecutor, was comfortable seating the prospective juror. In contrast, the state court appropriately assessed the genuineness of the prosecutor's motive and concluded, after an analysis of all circumstances, that the prosecutor's intent was race-neutral.

In sum, Petitioner has not presented, nor has this Court found, evidence to show that the state court's review of the Batson motion denial was based on an unreasonable application of the applicable law. Absent such evidence and in light of the deference owed to the state court's thorough analysis, this Court finds that habeas relief is not warranted.

### B.     **Motion for Juror Information**

On direct review, the California Court of Appeal rejected petitioner's claim, stating as follows:

> Defendant claims the trial court abused its discretion in denying his motion for release of jurors' addresses and telephone numbers. We conclude that the motion failed to state good cause for release of jurors' information.
>
> A.     *Background*
>
> Defendant moved for release of juror information after the verdict. His motion was supported by a declaration from defense counsel. Counsel stated that, on February 2, 2018, one Gary Wilson found a letter outside the courthouse. [footnote omitted]

15

The letter—undated, unsigned, and handwritten on lined paper—stated: "To Whom it may concern: [¶] In the court case The People vs Gilbert Smith witch [sic] is currently in trail [sic] in Department 20 I would like to inform the judge, the D.A., and Mr. Smith's lawyer that one of your jurors has been openly talking about this Brinks Robbery case. I was present during this conversation, however I wish to remain anonymous because I am a friend of a friend who stated they previously hired Mr. Smith for his lawn services in the past. I feel justice will not be served if you have a juror openly and bluntly speaks on what is going on and what their vote or decision will be before they even hear all the evidence or testimonies. Therefore I am notifying the courts [sic] of this outrageous acts in lieu of this knowledge[.] May justice prevail."

The declaration continued that, on March 2, 2018, Wilson gave the letter to his son, Daniel Walker, a Brink's supervisor. The same day Walker emailed the letter to Brink's management. On March 4, 2018, a Sunday, the prosecutor, having just learned of the existence of the letter, emailed it to defense counsel.

The record contains three reports about the circumstances surrounding the discovery of the letter, prepared by an investigator from the district attorney's office.

The first stated that the investigator had contacted Wilson and Walker and obtained their statements. The investigator also described viewing video from security cameras in the area where the letter was discovered by the bike rack at the courthouse. The video could record individuals in the area but was of poor quality and race and gender could not be determined. Video on the date the letter was discovered, prior to its discovery, showed a person in a dark jacket smoking near the bike rack at about noon.

The second report summarized a telephone call with Wilson. Wilson stated that, on February 26, 2018, he rode his bike to the courthouse to go to the jury commissioner's office regarding his failure to report for jury duty. When he finished at about 2:00 p.m., he went to the bike rack, where he saw a piece of paper in the low-growing shrubs nearby. The note was folded and partially crumpled. He did not believe it had been there long because it was not wet or damp. The note mentioned a case involving an attempted robbery of a Brink's truck. He knew about the case because his son works for Brink's and had told him about the shooting and attempted robbery. Wilson gave the note to his son on March 2, 2018.

The third report described a telephone call with Walker in which he stated that, on March 2, 2018, Wilson told him he was outside the courthouse smoking and noticed the note in the bushes. Walker emailed the note to Brink's management and kept the original note in a safe.

The jury convicted defendant on March 2, 2018. According to the statement of facts in the prosecutor's opposition to defendant's motion, the prosecutor learned of the note on March 4, 2018, during a telephone call with a Brink's security manager regarding the conclusion of the trial.

On March 23, 2018, the court heard defendant's motion and denied it. The court ruled: "In the present matter it was an unsigned letter that was located discarded on the ground outside the courthouse. The author claims to have witnessed unspecified jurors ultimately talking about the case, People versus Smith, during the course of the trial, and, as stated, it is an unsigned letter with nothing specific as to which jurors and what was being said. [¶] The Court's of the opinion without further foundation, authentication and more specific facts, the Court would not find, and does

not find, good cause to unseal the jurors' records. To find otherwise would allow unsealing of jurors' personal identifying [information] based on rumor and hearsay with no meaningful opportunity to assess credibility [of] anyone claiming misconduct, and for that reason, the defense motion is denied."

B.   *Analysis*

After the verdict in a criminal jury trial, the record of personal identifying information of trial jurors is sealed. (Code Civ. Proc., § 237, subd. (a); *Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1087 (*Townsel*).) A defendant may petition the court for access to personal juror identifying information in the court's records to communicate with jurors to develop a motion for a new trial. (Code Civ. Proc., § 206, subd. (g).) The "petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information." (*Id.*, § 237, subd. (b); see also *id.*, § 206, subd. (g).) "Absent a showing of good cause for the release of the information, the public interest in the integrity of the jury system and the jurors' right to privacy outweighs the defendant's interest in disclosure." (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1430.)

Good cause " 'requires "a sufficient showing to support a reasonable belief that jury misconduct occurred . . . ." [Citations.]' [Citation.]" (*People v. Johnson* (2015) 242 Cal.App.4th 1155, 1161-1162.) The defendant must show that a "juror's conduct was 'of such a character as is likely to have influenced the verdict improperly' (Evid. Code, § 1150, subd. (a)) . . . ." (*People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1322 (*Jefflo*).) "Good cause does not exist where the allegations of jury misconduct are speculative, conclusory, vague, or unsupported." (*People v. Cook* (2015) 236 Cal.App.4th 341, 346.)

We review an order on a motion for disclosure of jurors' identifying information for abuse of discretion. (*Townsel, supra*, 20 Cal.4th at pp. 1096-1097; *People v. Johnson* (2013) 222 Cal.App.4th 486, 492.)

The inadequacies of the anonymous, discarded letter in establishing good cause are manifest, as the trial court noted. The letter did not identify the writer or the juror in question. The letter refers to a conversation where the writer heard a juror talking about the case. The writer claims the juror discussed what their vote would be before all the evidence was presented. However, how the juror would vote is not disclosed. The circumstances of the conversation, when or where it occurred, are not related. In short, the letter is devoid of details of supposed juror misconduct.

Contrary to defendant's argument, the letter did not have the "ring of authenticity," but more of a "ring of advocacy." The writer characterized the juror's reported statements as "outrageous acts" and closed with "May justice prevail." The writer admitted he or she was a "friend of a friend" of defendant, ostensibly as a reason for remaining anonymous.

Lastly, the letter refers to the writer's desire to "notif[y] the courts," as well as counsel for the parties. Yet, the letter was left in the bushes by a bike rack outside the courthouse, when it could have [been] submitted directly to the court and counsel without compromising the writer's anonymity. Whether the letter was planted, dropped, or abandoned is not discernable on the information available. But its deposit

1 | outside the courthouse adds to its questionable nature.

2 | ECF No. 11-1, pgs. 13-17.

3 | In a footnote, the state court added:

> Defendant alleges that the letter was withheld until after the verdict by Brink's employees. There is no support for this allegation in the record, which indicates the letter was provided to the prosecutor by a Brink's employee, who was unaware of the timing of the jury verdict, and the prosecutor promptly provided the letter to defense counsel. Moreover, any delay in conveying the letter to defense counsel is attributable to the writer, who evidently decided not to submit it directly to the court and counsel but rather deposited it in a fashion in which it might never have been found.

Id. at 17 n.7.

The state court concluded as follows:

> Accordingly, the court properly viewed with skepticism a letter by an anonymous writer discovered in the bushes outside the courthouse reporting in a vague and conclusory manner the hearsay statement of an unidentified juror as support for a motion for disclosure of juror information. (*Jefflo, supra*, 63 Cal.App.4th at p. 1322.) The purpose of the claim for disclosure of personal juror information was to identify and contact the juror, which could only be accomplished by canvassing members of the jury.
> Contrary to defendant's argument, this was an impermissible " ' "fishing expedition" to search for possible misconduct.' " (*People v. Avila* (2006) 38 Cal.4th 491, 604.) We find that the trial court did not abuse its discretion in denying defendant's motion for disclosure of jurors' personal identifying information.

ECF No. 11-1, pgs. 17-18.

The Court agrees with Respondent that relief is not available under either applicable standard of habeas review because there is no clearly established law on the subject of access to juror information following a jury trial.  For the purposes of evaluating habeas corpus petitions, the entirety of applicable law is limited solely to the substance of Supreme Court cases in effect when the state court ruled.  See Howes v. Fields, 565 U.S. 499, 505 (2012). Even more specifically, this Court may only consider Supreme Court holdings which squarely address the claim at issue and provide a clear answer. See Liao v. Junious, 817 F.3d 678, 689 (9th Cir. 2016). Not even circuit court precedent can "bridge the gap" to an issue not yet directly addressed by the Supreme Court. See Glebe v. Frost, 574 U.S. 21, 24 (2014); See also White v. Woodall, 572 U.S. 415, 427 (2014).

Moreover, while the Supreme Court has not squarely addressed the precise issue Petitioner raises here, the Supreme Court has described a "no-impeachment rule," holding that a juror's testimony regarding the mental processes involved in reaching a verdict is not to be considered.  See Pena-Rodriguez v. Colorado, 137 S.Ct. 855, 864-65 (2017).  To the extent Petitioner sought information that would have resulted in testimony from a juror concerning deliberations, the state court appropriately denied relief consistent with the no-impeachment rule.

### III.  CONCLUSION

Based on the foregoing, the undersigned recommends that Petitioner's petition for a writ of habeas corpus, ECF No. 1, be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections.  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  February 22, 2024

DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE